IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DOES, C.B. and J.B.                                              PLAINTIFFS/
                                                      COUNTER-DEFENDANTS

v.                         No. 4:23-cv-1039-DPM

PULASKI COUNTY SPECIAL SCHOOL                            DEFENDANT/
DISTRICT                                              COUNTER-CLAIMANT

ORDER

L.B.'s parents, C.B. and J.B., made two due process complaints against the Pulaski County Special School District. Each alleged violations of the Individuals with Disabilities Education Act on their daughter's behalf. After an administrative hearing officer granted them relief on some of the claims they made against the District in both proceedings, L.B.'s parents brought this case seeking attorney's fees. The District counterclaimed with an appeal of the hearing officer's orders on the merits. It says the hearing officer wrongly decided—in both instances—that it had denied L.B. a free and appropriate public education. Each side seeks judgment on the record in the District's appeal of the hearing officer's decisions. L.B.'s parents also move to dismiss the District's amended counterclaim because, they argue, the District's appeal is moot. The Court ordered additional briefing on mootness, which the parties helpfully provided. They leave the fee

issues for another day. Whether the parents are entitled to reasonable attorney's fees and costs depends, of course, on whether the District prevails on the merits.

*

L.B. is autistic. She started school in the District in kindergarten, where she was found eligible for special education. Extensive testing showed that L.B. needed significant attention to her reading, social, and behavioral skills. She also needed occupational therapy. The District provided her with an appropriate individualized education plan.

L.B. made small improvements during kindergarten. By some metrics, her reading ability decreased slightly, by others it increased slightly. By the end of kindergarten, though, L.B. was still reading at a prekindergarten level. *Admin R. 1670; 1742*. Her math skills also showed a bit of improvement. And L.B. was creating stronger relationships with other students. The District concluded that she was still eligible for an IEP when she began first grade.

Her first-grade IEP addressed L.B.'s reading and behavioral difficulties, her need for speech therapy, her struggles with social skills, and gave her other general accommodations. But she still lost ground academically that year. In reading, L.B. ended first grade in the fifteenth percentile on the NWEA Map test. *Admin. R. 3723*. She was still at the prekindergarten level—two full grades behind where she

should have been. In math, L.B. declined from the thirty-fourth percentile at the end of kindergarten, to the eighth percentile at the end of first grade on the NWEA Map test. *Admin. R. 3723–25.* That year, she also was diagnosed with dyslexia. In a bright spot, she made great strides through the school's dyslexia-intervention program, the Sonday System. Within that system, L.B. progressed from a level eight to a level twenty-one in about one year. *Admin. R. 2332; 3450–51.*

At the end of first grade, in April 2022, the District considered L.B.'s IEP for the coming school year. The plan was much like the one offered in first grade, even though she had experienced significant academic struggles in many areas during the last year. The District would no longer offer L.B. speech therapy, even though the most recent evaluation—provided by her parents—recommended it as medically (though not educationally) necessary. The second grade IEP also had a new goal: Develop L.B.'s ability to react appropriately to her peers. But the plan decreased her social skills instruction from 150 to 90 minutes per week. It did not include any structural support for L.B.'s floundering math skills. And it didn't recommend extended school year services. *Admin. R. 1430.*

A few months into the second-grade school year, L.B.'s parents requested a due process hearing from the Arkansas Department of Education. They alleged that L.B.'s kindergarten, first grade, and

second grade IEPs failed to comply with the IDEA, because they weren't reasonably calculated to allow her to make appropriate progress in light of her individual circumstances. L.B.'s parents requested a second due process hearing during the summer between her second and third grade years. They alleged more IEP failures and believed that L.B. should have been offered an extended school year at the end of second grade.

In separate administrative hearings, the same hearing officer found that the District had denied L.B. her due education during second grade and failed to provide beneficial extended year services during the summers after first and second grade. As relief, the officer ordered the District, among other things, to hold an individualized education program conference at the end of every nine-week period of L.B.'s third-grade year, to provide her compensatory education through July 2024, and to consider whether she should receive extended school year services at the end of her third-grade year. The District fully complied with the orders. L.B. remains a student in the District. She's now in fifth grade.

*

The mootness issue comes first. It goes to the Court's jurisdiction to hear the case. *Honig v. Doe*, 484 U.S. 305, 318 (1988).

The Court stands by its earlier rulings. *Doc. 24*. The District's appeal is technically moot because of its full and immediate compliance with the hearing officer's orders. *Kennedy Building Associates v. Viacom, Inc.*, 375 F.3d 731, 745 (8th Cir. 2004). The exception—for issues capable of repetition yet evading review—is in play. *Iowa Protection and Advocacy Services v. Tanager, Inc.*, 427 F.3d 541, 544 (8th Cir. 2005). The District has demonstrated that the calendar, coupled with the specific relief ordered, made securing timely judicial review difficult and impracticable, both for the parties and the Court. It is better for the parties to focus on the student and the classroom rather than the courtroom. And it is better for the fair judicial administration of all cases for the Court to handle IDEA cases promptly but not on a special rocket docket. All cases are important.

The mootness issue therefore comes down to the exception's second element—whether the parties' disputes are likely to be repeated. The District has carried is burden of showing that they are. It's true that some IDEA cases, under similar circumstances, could be mooted by a full implementation of the hearing officer's orders. *E.g., Patrick G. ex rel. Stephanie G. v. Harrison School District No. 2*, 40 F.4th 1186, 1205–06 (10th Cir. 2022). But the Court also declines to endorse a hard-and-fast rule that would have the practical effect of requiring a district to re-litigate substantially similar issues on substantially similar

facts every school year. Here, L.B.'s parents pressed the District—twice in one year—for failing to provide her with a FAPE. Specifically, they challenged the sufficiency of the L.B.'s IEP. They twice argued that it failed to include appropriate services in social skills, reading, math, written expression, dyslexia intervention, speech therapy, and occupational therapy. *Admin. R. 161–62 & 2682*. And the hearing officer found twice that the district had failed to offer L.B. extended school year services. It's reasonable to conclude that the District and L.B.'s parents will continue to disagree in good faith on these areas, especially given L.B.'s disabilities and young age. *Compare Honig*, 484 U.S. at 318–23. Plus, as the District argues, beyond specific services during each school year, which may vary some with L.B.'s circumstances, is the general issue of extended services in the summer. That same dispute will likely recur again and again. The parents' motion to dismiss the District's counterclaim as moot is denied.

*

Now to the merits. Here, too, the District bears the burden of proof, as the party challenging the hearing officer's decisions. *E.S. v. Independent School District, No. 196 Rosemount-Apple Valley*, 135 F.3d 566, 569 (8th Cir. 1998). The Court must evaluate where the preponderance of the evidence is, but not second guess the educators' decisions about sound educational policy. *Board of Education of Hendrick Hudson Central*

*School District, Westchester County v. Rowley*, 458 U.S. 176, 206 (1982). The Court will give due weight to the hearing officer's decision—judicial review in IDEA cases "is, in reality, quite narrow." *Osseo Area Schools, Independent School District No. 279 v. A.J.T. by & through A.T.*, 96 F.4th 1062, 1065 (8th Cir. 2024) (quotations omitted). The deep issue is whether the hearing officer got it right: Was L.B. denied a free and appropriate public education, from 29 April 2022 through 30 May 2023? After considering the whole record, the Court concludes she was.

There's no question that L.B. faced significant struggles at school—particularly in reading. And there's no question that she made progress in some areas. School staff so testified. *Admin. R. 395, 746, & 1200–01.* L.B. made good strides in the Sonday System's dyslexia intervention program. *Admin. R. 2321–52.* Her reading scores, by some measures, improved slightly during second grade. *Admin R. 3721–22.* By other measures, though, they fell. *Admin R. 1728.* And "merely more than *de minimis* progress" is not what the IDEA demands. *Endrew F. ex rel. Joseph F. v. Douglas County School District RE-1*, 580 U.S. 386, 402–03 (quotation omitted). The statute requires that the District formulate an IEP that allows L.B. to pursue academic and functional advancement, considering her strengths and weaknesses. 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(IV); *Endrew F.*, 580 U.S. at 403. By the end of first grade, it should have been apparent to the District that what it had been

doing to improve L.B.'s reading skills wasn't working. According to the NWEA Map test, she ended first grade still reading at a prekindergarten level. Despite the success she was making in dyslexia intervention, L.B.'s STAR Reading tests showed she was still struggling. At the beginning of second grade, the STAR Reading test put L.B. at the fourth percentile in reading. *Admin R. 1728.* Midway through the school year, she had dropped to the third percentile. *Admin R. 1729.* The District failed to adequately revise L.B.'s second-grade IEP to address her lack of progress in reading. Section 1414(d)(4)(A)(ii).

The District similarly erred when it removed L.B.'s speech therapy and reduced her social skills instruction in her second-grade IEP. Based on the progress that she observed, Ms. Bright, the District's speech therapist, recommended ending L.B.'s speech therapy services. *Admin R. 605–06 & 1434–45.* But L.B.'s most recent evaluation, performed in August 2022, concluded that speech therapy was medically necessary. *Admin R. 2054–57.* And L.B. had two behavioral goals on her second-grade IEP. *Admin. R. 1302.* She only had one in first grade. *Admin. R. 1327.* Despite this new goal, the second-grade IEP cut her social skills instruction almost in half, 150 to 90 minutes per week.

It's also concerning that the District did not include any math support in L.B.'s second-grade IEP. She still had a severe deficit in math by the end of first grade, though her scores improved slightly that year. *Admin. R. 1739.* But again, *de minimis* improvement is not enough. *Endrew F.*, 580 U.S. at 402–03.

Last, the extended school years. The hearing officer found that the district should have offered L.B. extended school year education after first and second grade. The Court agrees. Extended school year services are the exception, not the rule. ARK. DEPARTMENT OF EDUCATION SPECIAL EDUCATION AND RELATED SERVICES REGULATION 19.04.6. They should only be used to prevent significant regression. ARK. DEPARTMENT OF EDUCATION SPECIAL EDUCATION AND RELATED SERVICES REGULATION 19.04.10. L.B. made only slight objective academic progress during first grade, though. *See Admin. R. 1739–40.* And her test results from the end of kindergarten to the start of first grade showed she was at risk of backsliding over the summer. *Admin. R. 1739–42.* This was even more clear at the end of second grade, when L.B. continued to make only minor progress in reading, and her IEP team indicated that her rate of progress was a "significant concern." *Admin. R. 3304.*

All things considered, the preponderance of the evidence supports the hearing officer's determinations. L.B. was denied a free and appropriate public education from 29 April 2022 to the end of her second-grade year. She was also denied a FAPE on 30 May 2023, when the District declined extended school year services. The parents' motion for judgment on the record, *Doc. 18*, is granted. The District's motion, *Doc. 20*, is denied. The parents are entitled to reasonable attorney's fees and costs. Judgment will issue. Any motion for attorney's fees and costs is due within thirty days after Judgment.

So Ordered.

*[signature]*
D.P. Marshall Jr.
United States District Judge

10 September 2025